Good morning, Your Honors. Jacques Leboeuf for Plaintiffs and Appellants Clifford and Lauren Chandler. I'd like to reserve four minutes for a moment. This case arises out of the defendants' exhaustive and wide-ranging efforts to determine how much money they might be able to collect from my clients, the Chandlers. During the course of that investigation, the defendants and their agents obtained confidential information from Mr. Chandler's former stockbroker, purposefully sought out and obtained the Chandlers' Social Security numbers, obtained their credit reports, surreptitiously photographed their house, and tried in vain to learn the balances in their bank accounts. The district court found that the investigator who obtained the credit reports had violated the Fair Credit Reporting Act, which I'll pronounce FICRA, as a matter of law. Nonetheless, the court found that the Chandlers' claims should all be disposed of on summary judgment. Where is the underlying dispute now? Is it – where is it being litigated and what stages is it at? I thought that might come up, Your Honor. To my knowledge, it is resolved. But the parties were unable to arrive at a consensus about the success of this particular offshoot of it, and so this piece still lives. Has there ever been a stab at mediating this case? Yes. In fact, through the Ninth Circuit's mediation office, and we were unsuccessful. I'd like to begin, if I could, by addressing first the possibility of vicarious liability under FICRA, followed by direct liability, and then finally the plaintiff's state law claims for invasion of privacy and breach of fiduciary duty. The analysis of vicarious liability under FICRA really rests on three key facts. First, the district court determined that the investigator, Mr. Pruitt, violated FICRA as a matter of law, and the defendants have never seriously disputed that he did so while acting on behalf of the defendants. And finally, the district court determined that the defendant, Mr. Pruitt, violated FICRA as a matter of law, and  of the defendants. Okay. So let's assume that what you say is correct. Still, where do you tie your vicarious liability theory into the statutory language of FICRA? In other words, FICRA is a statute. If there's liability of someone who didn't negligently or intentionally access the report, where does it – what's the language of the statute that creates that liability? Well, two points. First, I mean, the district court found that Mr. Pruitt had, in fact, acted either negligently or willfully. I understand Pruitt did. Okay. What I'm raising my question about is your argument that because Pruitt did it, the lawyer is responsible, who hired Pruitt, or because Pruitt did it, not only is the lawyer who hired Pruitt responsible, but the company that hired the lawyer is responsible. Yes, exactly. Organization, rather. So explain to me where the statutory – how the statutory language would be accommodated – accommodated with your theory. Certainly, Your Honor. That is precisely the point where the relatively recent U.S. Supreme Court case of Meyer, which we cited in both of our briefs, comes into play. In Meyer, the Court announced – oh, I suppose I should back up. There is a more basic answer, which is FICRA is completely silent on the question of vicarious liability. It doesn't say a word about it. How do you – how do you get there? How do I get? FICRA says what – who's liable and how they are liable. I don't get how it's silent. It identifies how it specifically talks about how a natural person can be liable for a credit violation. Precisely, Your Honor. And the same is true of – So how is it silent? It doesn't say nothing on it. It doesn't – it doesn't address the concepts of vicarious liability of agency. That's quite true. It doesn't use those words. But it says the basis upon which a natural person can violate the Act. The same is also true – that is correct. The same is also true of the Fair Debt Collection Practices Act, of the National Labor Relations Act, of the – another Federal labor statute that I always confuse with the NLRA, of ERISA, of Title VII. And those were all cases that the Meyer Court pointed to as examples of Federal statutes that are silent on the question of vicarious liability. And each of them has language that says a natural person can violate the Act only by false pretenses and negligence or intentional conduct. I believe that the language is the same in all relevant respects. You're representing that the language is precisely the same in every one of those cases, including Myers. In all relevant – in all relevant respects, Your Honor, yes. They – several of the statutes specify minutely who is to be liable. In fact, I know that we addressed this point in our closing brief. And also, the two cases that were cited in my letter to the Court regarding supplemental authorities dated about two weeks ago. Do the Act specify what the penalties are for violation? Yes, it does, Your Honor. And you aren't seeking penalties for violating the Act, are you? I'm trying to understand your theory. What are the damages you're trying to get? Trying to get tort damages? Oh. Well, the statute provides for – there's a certain statutory damage in the event of a willful violation. And then in the absence of a willful violation, it's just a regular tort damages. And there are also provisions for attorney's fees. So you can tag Stoneage and his client for a willful violation? Is that just your idea? Well, the district court didn't resolve – I'm not talking about the district court. I'm talking about your theory. I suppose it's possible, yes, Your Honor. Well, but what are you going after him for? Well, we're seeking to hold him vicariously liable and the other defendants for Mr. Pruitt's violations. Yes, and absent any negligent conduct on their own part, is that the idea? Well, we have a – He's strictly liable. In other words, if somebody that they retain to do an investigation does something, they are absolutely no-holes-barred, flat-out liable. Yes? Yes, Your Honor. Why would – how does that make sense? Well, Anglo-American courts have for several hundred years accepted the notion that if an agent commits a tort or a crime while acting on behalf of a principal, he's not – they're not – they didn't direct him to do this. Yes, that is – He wasn't – he wasn't acting in the course and scope of employment for the attorney. Well, Your Honor, that's an interesting point. I mean, the course and scope of employment is usually determined by the agent's reasonable interpretation of the instructions that he or she has been given. How could an – how could anybody reasonably interpret an oral request for an asset search confirmed in writing a request for an asset search where the agent himself upon the initial conversation did not check the box for a Fair Credit Reporting Act credit report search? How could it remotely be reasonable for him to have interpreted a request for an asset search as a request for a credit report? I have six points, Your Honor. One good one would be. First, Mr. Pruitt testified that when he checks the box that says asset search with FCRA purpose, it is because the client specifically uttered the words, I would like you to perform an asset search, and I have a permissible purpose under the statute. So the absence of that – a check in that box, he said, simply means that nobody specifically told me that he had a proper purpose under FCRA. At the same time, however, he – the defendants used words like claim, which indicated to him that there was a judgment in place. Well, that's fairly unreasonable, isn't it? I mean, claim means a claim. Judgment means a judgment. If he – I'm concerned with the same exact point that Judge Reimer is raiming. If he's told we have a claim against this person, we want to investigate it, I don't see how I could equate that as – how I could view it like a reasonable jury or fact finder could conclude that the person who said, I've got a claim is telling him they've got a judgment. I do believe that's a jury question, Your Honor. He was – the other things he pointed out were the defendants were referred by a collections attorney, so this sort of got him thinking that this was a collections matter. They seem almost to have been careful to dance around the idea of whether there was a judgment or not. Well, you have to have – to go to a jury, you have to have something from which a rational jury could find on that – on the evidence, not speculation. Your position is essentially that almost as a matter of law, a request for an asset search includes a request for a report. Well – That doesn't make sense to me. Well, Your Honors, I mean, certainly one way of finding assets is to look at a credit report. I think we can all accept that, and that's precisely why Congress allows credit reports to be checked when somebody has a judgment, because that's one of the ways you find out where the assets are. And so the question is, would it have been possible for this – for Mr. Pruitt to have concluded that there was a judgment in this case? And I think that was a possibility. Let me ask you once more. What are the damages you want? They've yet to be determined, Your Honor. Well, what is the measure of them?  I see what you're saying. And how are you – Well, I think primarily the thing that the Chandlers are worried about is the fact that Mr. Pruitt forwarded this credit report to some other private investigator who had in the past demonstrated an unusual ability to locate bank account information based only on the information in credit reports. And he was never heard from again. And so the Chandlers, to one degree or another, face an ongoing threat of having this information fall into the wrong hands. They don't know where that information went. And that's a legitimate concern and one that Congress has determined is compensable. Congress has determined it's compensable against a person who negligently or intentionally gets a credit report without a proper purpose. Yes, Your Honor. To say that the As You Sow organization is negligent in this situation when they just hire a lawyer to assert a claim, I don't see how you can tie that into the statutory language. I understand what the lawyer then – it still seems to me somewhat remote, but I understand your argument is that when the lawyer says, investigate this, we've got a claim, you think a jury could find that's negligent, that the lawyer didn't say, and don't – we don't have a judgment, don't get a credit report? I think a lawyer could find that's negligent. I think a lawyer could – I'm sorry, yes. A lawyer – I mean, we lawyers are generally charged with knowledge of the law. Mr. Pruitt was not a lawyer. One could – you know, a jury could find that it was up to Mr. Stonich and also Mr. Fahn, who's another lawyer, to – to spend half an hour looking into what the possible I would we presume that he had noticed that there was going to be a violation of the law? That's what you're asking. No. No. He just needed to be specific with his instructions. I just can't imagine anything more specific than asset search. Okay. I guess we understand what your point is. I'd like to turn, if I could for a minute or two, to the state law causes of action. Yeah. Why don't you, in doing that, at least at some point, please address this. In your opening remarks, you said that the stockbroker, the co-founder of AYS, the stockbroker defendant had disclosed confidential data to the lawyer, to the organization. Now, as I understood what the district court said, was the district court, in giving summary judgment, I think said there was just a failure of proof on your side of the case on that. In other words, the stockbroker gave a statement or declaration saying, I didn't disclose anything confidential, and there's not anything adequate on the other side of that. At least that's how I read the district court. Do I misunderstand that? So what I wanted you to do is tell me what evidence is in the record that raises a genuine issue of material fact that the broker disclosed something confidential. Certainly, Your Honor. First of all, the defendants never disputed, because it's set forth in the preliminary report that Mr. Fahn prepared for Mr. Stonich, which in turn was handed to Mr. Gray, that Mr. Van Dyke, the stockbroker, had disclosed Mr. Chandler's investment style and the general size of his portfolio within an order of magnitude. They said, so the idea, not on the investment style, but on the portfolio size, is that the stockbroker tells the lawyer, this person has a net worth of, let's say, in seven figures. Yes. And that's confidential. Well, confidentiality is usually determined by a subjective and an objective test. The problem is there's no evidence of a disclosure that was in turn disclosed that was communicated for a confidential purpose and not to anybody else. Where is any evidence at all that Chandler communicated something to Van Dyke that Van Dyke disclosed to someone else? I think that would be on page 1031 of the excerpts of record, where Mr. Chandler says, I provided confidential information to AYS on my investment activities. Well, there's probably no doubt about that, but that's not my question. My question is, where is there evidence that Chandler gave information to Van Dyke and what that information was that Van Dyke then in turn disclosed? The size of his portfolio, Your Honor. Mr. Van Dyke said, I disclosed it to Van Dyke. I disclosed it to Van Dyke, but I also told Van Dyke that my portfolio was $643,000 and 32 cents. It was a disclosure that was inherent in the nature of the relationship. Except for seven months out of a 20-year span of friendship. And there's no dispute to Van Dyke's statement that he blabbered his investment strategy all over the place. Oh, no, there is a dispute about that, Your Honor. Okay. What specific evidence is there of a communication from Chandler to Van Dyke that Van Dyke in turn disclosed? He – Van Dyke learned the size of Mr. Chandler's portfolio because of his confidential position, because of his position as a fiduciary. He then turned around and disclosed that information, this is undisputed, to the other members of AYS. If he had been a lawyer, he'd be disbarred. You're still missing my point, and that is confidence. What communication occurred that was in confidence? If I tell – if I tell everybody in this room that I invest in municipal bonds, the fact that my broker knows it doesn't mean that that's confidential. If I tell my broker, please invest this million-dollar portfolio for me, the fact that my portfolio is worth a million dollars is confidential information. Is there evidence that that occurred? I think that a jury could find that a – that a brokerage relationship that lasted seven months entailed a couple of trades. Okay. All right. I think that's – you have all the time. I will save the remainder of my time for a moment. Good morning, Your Honors. Carol Healy for defendants as you so, Thomas Van Dyke and Larry Fon. I'll try to be very brief. I think Your Honors understand that what appellants are trying to do is greatly enlarge the boundaries of agency law in a context that it's not appropriate. I'd like to get your response to the argument that the Supreme Court in Meyer clarified the landscape or changed it in some way and why it does or doesn't affect the analysis here. First of all, Myers was a racial discrimination case and you have to consider the context of the facts in making decisions on how agency law is to be applied. There's no question that agency law applies to this case. There's numerous cases that have applied agency law to this case and it has always been in the context of apparent authority, always. Plenty of precedent. The courts have considered it. There's got to be something, as Your Honors have said, that ties in the purposes of the act to why you should apply the applicable agency principles. And here, super broad, strict liability simply is manifestly unfair and unjust to the innocent persons who have not asked for, received, obtained, used, or in any way got these credit reports. This is something that I think would be appropriate for another context if this were to come up in a case where the people charged to be liable were somehow users, people associated with credit reporting agencies, people who had accounts. Then there would be appropriate, such as holding John Portek liable. In this case, you have to remember that Pellants aren't talking about the fourth party here. It's not just, as you so, John Stonich and Alan Pruitt. It's Alan Pruitt, the investigator, who has no license, who has no ability to get credit reports, so how are we supposed to foresee that he's going to go get a credit report? John Pruitt then goes to his neighbor's computer, accesses his neighbor, Jack, Jack, no, John Portek's account, and basically steals the code and takes the code and uses it in order to get the credit reports. So to ask us to foresee that something like this is going to happen is just absurd. On the invasion of privacy issues, Your Honors, I think it doesn't even need addressing because there was no outrageous and extreme conduct that would support such a cause of action as a matter of law, and the cases in California clearly show there was no abuse of discretion in the judge's ruling on the invasion of privacy. How about just Mr. Van Dyck's potential liability for disclosing a confidence? Could you address that? Because as I recall, what I saw on the record, there was evidence that the organization was told by Van Dyck that Chandler had a net worth in the seven-figure area when they were investigating. Yes, Your Honor. Does that raise, given that he's a broker and the argument made by appellant that the size of a portfolio is confidential, what's your response to that? Well, first of all, Your Honor, the fact that they had been friends for many, many years, they went to college together, they grew up together, they founded this company together, there was an awful lot of information communicated between those people that was not in a confidential relationship. And I think Judge Walker simply decided that there had been no proof presented by Mr. Chandler that that information about the size of the portfolio and that he traded in risky ventures, that that had come from that broker relationship. There was zero evidence presented on that point. And very simply, that's why the judge granted the motion. You would normally expect a broker to come into contact with that kind of information. And that's why I'm trying to analyze this, you would expect a broker to get information on net worth or at least a, you know, a segment of a portfolio that someone's investing through that broker as part of their job.   Now, maybe they would also get that information as a buddy or a friend or a colleague, you know, but. Well, it's one thing, Your Honor, if he's talked about specific trades that were made or if he talked about a specific size of the portfolio, but that, this is very generic information that people share with one another all the time. Well, everybody doesn't tell their friends what their net worth might be. Yeah, and seven figures. Well, maybe if they are, they do. I don't think so. Not most people I've met who have net worths that may be large. A lot of them are pretty close to the vest. So at least someone might have the right to keep that confidential if they want to. So the question I guess I have is, what's in the record that would lead one to think that Mr. Chandler disclosed that he had a seven-figure net worth to people other than a broker? Mr. Van Dyke's declaration is the only evidence on the point, Your Honor. Okay, and it says that he. That he disclosed that information elsewhere. He disclosed it elsewhere, not in the broker. Right, and he never, and that Mr. Van Dyke affirmatively states that he has never disclosed anything that was acquired in confidence. Okay, and then Mr. Chandler, in contrast, did not submit an affidavit or declaration saying I disclosed my net worth in the broker relationship, but not otherwise. He did not. Thank you, Your Honors. Thank you. Basil Plasteris, Plasteris and Terizzi for appellee John Stonich. As this Court has already raised most of the issues I intended to address, I'll try to be as brief as possible. With regards to the Myers case, let me say that that is distinguishable easily for two reasons at least. Number one is the Myers firm had the capacity to pull credit reports using a subscriber. The Myers firm had forms on which the employees of the firm could write down the request for a credit report and submit it directly to the subscriber. Therefore, for my second point, in the Myers case, the Court determined that the law firm cloaked the employee, not an independent contractor, not an agent, but the employee with apparent authority to pull the credit reports. And that leads us right into the FCRA purpose and intent. And that is to protect the privacy of consumers by requiring that those in the credit industry establish procedures to protect the privacy of individuals. And if they fail to do so negligently, then they are responsible. In our case, the facts are- Because it was expanded to include individuals. Yes, person was used. In the industry. Yes. And there's no question that a person who's not in the industry might be able to willfully violate the act, or an employee would be responsible, not just the corporate employer. I think that that was the intent. It was never intended by that act to impose strict or vicarious liability. As has been said in many cases, Congress knows how to impose third-party liability when it wants to. And the statute specifically says willful or negligent. There are- You addressed the argument of Appellant's counsel that it's negligent of a lawyer who's versed in the law to not tell a private investigator who's asked to do an asset check, you know, don't access credit reports illegally. Thank you for asking that. I was just about to go to that. I spent a couple of hours the other day looking for statutes and acts that protect consumers' privacy, both federal and state. And in the space of two hours, I found 31 different acts. And I'm not going to read them all to you, but I would- There's the Federal Privacy Act of 1974, the Federal Financial Modernization Act of 99, the Federal Trade Commission's Privacy Rule, the Federal Bank Holding Company Act of 1956, California Financial Privacy Act, et cetera, et cetera, et cetera. Thirty-one of them. And this is by no means exhaustive or even the majority. And this only pertains to privacy. Is a lawyer obligated to list every possible violation that an independent contractor who's licensed by the state of California might do? Is he supposed to go through 106 or 507? What if he misses the 508th? I mean, it's rather absurd to say that the attorney- And this attorney, by the way, has absolutely no experience in the credit industry, no familiarity with the FCRA, no involvement in debt collection. There's no history there and no reason. He's not in the industry. And the FCRA- Well, if he had gone intentionally and said, I want a credit report, then that would be a willful violation and it would fall under the person's 1996 amendment. But he didn't do that. He had no reason even to know that the private investigator had the capacity to pull the credit reports. And by the way, an examination of these credit reports, they are in toto. There's two of them, one for the husband, one for the wife. They are in toto less than three pages. And if you look at them, there is nothing of significance in there. No attorney who's looking for assets that are leviable, subject to judgment, is going to care about someone's credit. They don't care what credit cards they have. Credit is not a leviable asset. Or debts, debts are not necessarily at all significant to collection of assets. He asked for what any attorney would ask for, and that's, I want an asset search. And while counsel can try to characterize this as broad reaching and exhaustive, it's still within the context of an asset search and not a credit report. Further, Mr. Stonshaw's actions serve a valuable public purpose. And that is a public policy, in fact, and that is not to bring litigation unnecessarily that is not going to benefit anybody. And if one could imagine attorneys being prevented from doing asset searches because private investigators, expert witnesses, court reporters, or somebody else might do something in violation of the law, then they're going to have to bring litigation in each and the door because they can't investigate the facts. They can't determine whether there's insurance. They can't find out if there's assets worth collecting. Nobody knows the number of cases that don't, that aren't filed because the defendant is judgment proof. But I can tell you in my practice, it's very substantial. And so here we have an attorney who was attempting to facilitate this important public policy. And to penalize someone who is not in the credit industry, who does not supervise the private investigator, who did not cloak him with any apparent authority, like the Bennett law firm did in the Myers case, is unfair and contrary to the ultimate goals of both the FCRA and the FCCRA in terms of public policy for unnecessary litigation. And that's all I have to say, and thank you. We get your point. Thank you. I'd like to address just a few points. First, I think the record shows that Mr. Chandler viewed his net worth as, that he subjectively viewed it as confidential information. And the jury could find that his broker learned that information from him. And by the way, the state of California has held that that's a legitimate belief. Second, credit reports do contain information about assets. That's why private investigators look to them. That's why Congress allows private investigators to look to them. It's not just a listing of your credit cards. It also says who else has been asking about you. Don't you think counsel has a pretty good point that asset searches are going to be routine in a lot of cases where people contemplate litigation? In other words, there are a lot of cases where it would be malpractice or negligent of a lawyer to start a lawsuit without checking whether the defendant has some assets, because it can just be a waste of their client's money. Yes, I suppose that's true, Your Honor. But the lawyer should be careful when he's conducting this kind of a search. So does the lawyer have to go through the – I know 500 laws might be an exaggeration. If the lawyer has to advise the investigator not to violate every single law, how do you get a grip on, you know, the scope of that? I think most lawyers have a sense that there are certain purposes for which you can look at a credit report. Actually, interestingly, in this case, they said, oh, by the way, you can look at Ms. Chandler's information as well, because we have a legitimate purpose, because he might be secreting assets or they might have joint accounts or that sort of thing. So that conveyed the idea that, look, we know that there are certain things that are off-limits, and they're not off-limits in this case. Okay. Thank you. You have used your time. Thank you, Your Honor. Thank you. The case just argued is submitted for decision. We'll hear the next case, which is
judges: Schroeder, Rymer, Gould